UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| KEVIN L. HUGHBANKS, | ) | Civ. 10-4064-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER GRANTING |
| ROBERT DOOLEY, Warden, Mike | ) | DEFENDANTS' MOTION FOR |
| Durfee State Prison, a/k/a Bob | ) | SUMMARY JUDGMENT |
| Dooley; | ) | |
| TIM REISCH, Cabinet Secretary, SD | ) | |
| DOC; | ) | |
| SUSAN JACOBS, Associate Warden, | ) | |
| Mike Durfee State Prison; | ) | |
| TAMI DEJONG, Unit Coordinator, | ) | |
| MDSP; | ) | |
| RANDY STEVENS, Sco. Property | ) | |
| Officer, MDSP; and | ) | |
| NICHOLE ST. PIERRE, Sco. Property | ) | |
| Officer, MDSP; | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Kevin L. Hughbanks, filed a pro se civil rights lawsuit under

42 U.S.C. § 1983 against defendants. Defendants move for summary

judgment. Hughbanks opposes their motion. Defendants' motion is granted.

I.    **FACTUAL BACKGROUND**

In the light most favorable to Hughbanks, the nonmoving party, the

facts are as follows: Hughbanks is incarcerated at the Mike Durfee State

Prison in Springfield, South Dakota. Docket 60 at ¶ 1. Although Hughbanks

denies this, his mailing address indicates he is incarcerated there. Docket

110 at ¶ 1. Hughbanks is a convicted sex offender, serving a sentence for third-degree rape and possession of child pornography. Docket 60 at ¶ 1. While Hughbanks also denies this, he has not cited to any evidence in the record to support his contention. *See* Docket 34-1, Hughbanks' Classification Custody Form (showing Hughbanks is serving a ten-year sentence for third-degree rape and possession of child pornography).

Hughbanks asserts his claims against defendants in both their individual and official capacities. Docket 60 at ¶ 8. Hughbanks challenges the South Dakota Department of Corrections' (DOC) correspondence policy, claiming that it violates the First and Fourteenth Amendments because the policy provides that unsolicited third-class/bulk-rate mail and free catalogs will not be delivered to inmates and inmates will not receive a rejection notice when these items are not delivered. Second, Hughbanks claims defendants violated his First Amendment rights when they rejected the books <u>Dirty Spanish</u> and <u>The Quotable Bitch</u>.[1] Hughbanks' third claim is that security officer Randy Stevens subjected him to cruel and unusual punishment in

---

[1] In his brief, Hughbanks appears to be attempting to assert due process claims relating to the rejection notices he was provided and the administrative remedy process relating to the denial of the books. These allegations were not included in Hughbanks' first complaint. Nor were they among the claims the court permitted him to add in his amended complaint. *See* Docket 51, Order Granting in Part and Denying in Part Hughbanks' Motion to Amend His Complaint; Docket 69, Amended Complaint. Thus, the court will not consider these claims.

violation of the Eighth Amendment by making comments, which Hughbanks characterizes as threats, in front of other inmates. Hughbanks asks that "prison officials deliver all mail that is sent to him that does not directly violate policy, including catalogs, magazines and pictures" and that "prison officials be ordered to stop using the rate/cost of postage or the cost of the item (catalogs) as a means to determine whether the item will be allowed or not." Docket 110 at ¶ 7. Hughbanks also seeks an order that prison officials provide him with <u>Dirty Spanish</u> and <u>The Quotable Bitch</u>. Finally, Hughbanks requests compensatory and punitive damages.

### A.   The Bulk-Rate Mail Ban and Rejection Notices

Inmate mail at the Mike Durfee State Prison is divided into two categories-packages and other correspondence. Docket 60 at ¶ 9. Packages are sent to the property office and generally contain books or personal property. *Id.* Magazines, catalogs, letters, and other correspondence are generally sent to the mailroom, although some catalogs are contained within packages sent to the property office. *Id.* Different staff work in each area. *Id.* at ¶ 10. Currently, Randy Stevens works in the property office and Nicole St. Pierre works in the mailroom. *Id.* The volume of mail varies that they are responsible for receiving, viewing, and processing. *Id.* at ¶ 11. Stevens estimates that he handles "roughly 30-35 incoming inmate packages per week, depending on the time of year." *Id.* St. Pierre estimates that she receives

3

and reviews approximately "350 letters, 50 magazines, 225 inmate outgoing letters, and 85 newspapers and packages each day, based on a recent count in January 2011." *Id.* Both Stevens and St. Pierre have additional responsibilities as well. *Id.* Hughbanks disputes this, asserting that "[m]ost of the actual work that is performed in the property office is performed by twenty-five cents per hour inmate workers that [Stevens] employees [sic]." Docket 110 at ¶ 11. When the mailroom and property staff receive and review inmate mail, they follow both DOC and Mike Durfee State Prison (MDSP) policies, including the DOC Offender Correspondence, DOC Pornography, DOC Inmate Personal Property, and MDSP Memorandum– Inmate Personal Property policies. Docket 60 at ¶ 12. Hughbanks disputes this. Docket 110 at ¶ 12.

The DOC correspondence policy implemented at MDSP and all state correctional institutions provides that, "[f]ree advertising materials, fliers, non-subscriptive third class/bulk rate mail, non-subscriptive or free catalogues or pamphlets will not normally be delivered to offenders." Docket 60 at ¶ 13. Because the policy provides that these materials will not be delivered if they are received, staff are not required to notify the inmate that the materials have been destroyed. *Id.* at ¶ 14. There is also no requirement that prison staff notify the publisher or other correspondent if an item is rejected or destroyed. *Id.* Hughbanks interprets this policy differently, arguing

4

"[s]tating that an item will not be delivered to an inmate in policy does not mean a rejection notice [to the inmate] is not required." Docket 110 at ¶ 14.

The prison receives a substantial amount of free advertising materials, fliers, non-subcriptive third-class/bulk-rate mail, and non-subscriptive or free catalogs or pamphlets. Docket 60 at ¶ 15. During January 2011, St. Pierre received and destroyed approximately 140 materials of this nature per week. *Id.* January is one of the slower mail months. *Id.* Stevens estimates he destroys approximately 10 materials of this nature per week. *Id.* Some bulk mail, like Bargain Books catalogs, are shipped to the prison in loads of 75-100 pieces at one time. *Id.* Hughbanks points out that the prison also receives "requested [solicited] third-class/bulk rate mail and catalogs addressed to inmates." Docket 110 at ¶ 15.

Hughbanks appealed the correspondence policy's ban on bulk-rate mail using the administrative remedy process. On May 1, 2010, Hughbanks filed an informal resolution request, arguing that the mailroom was not complying with the policy. Docket 60, ¶ 32. Hughbanks thought the policy required mailroom staff to notify him whenever any correspondence, including bulk-rate mail, was rejected and the reason for the rejection. *Id.* He requested that he receive notice of any piece of mail not delivered to him. *Id.* Defendant Tami DeJong responded by identifying the policy language, which provided that free advertising materials, including non-subscriptive or free catalogs, will

5

normally not be delivered to offenders. *Id.* Hughbanks subsequently filed a request for an administrative remedy, arguing that the mailroom staff was not delivering his catalogs and he had not received any mailroom rejection notices. *Id.* Defendant Susan Jacobs investigated Hughbanks' claim and prepared a response for Warden Dooley. *Id.* at ¶ 35. Warden Dooley stated in his response that free advertising materials, fliers, non-subscriptive third-class/bulk-rate mail, non-subscriptive or free catalogs, or pamphlets are not required to be delivered to inmates and do not require a rejection notice. *Id.*

Hughbanks subsequently filed grievances and administrative remedy requests alleging that the policy violated his First and Fourteenth Amendment rights and the First and Fourteenth Amendment rights of publishers. *Id.* at ¶¶ 26, 40. Defendants responded with the language of the correspondence policy and by noting that the policy would be reviewed on an annual basis. *Id.* at ¶¶ 26-43.

### B.   The Rejected Books

The DOC correspondence policy provides that correspondence or publications may be rejected if it encourages sexual behavior or may be detrimental to an offender's rehabilitation. *Id.* at ¶ 44. The policy specifically states that "included in this category are writings or illustrations depicting or describing child pornography, bestiality, homosexuality, or acts of sexual violence." Docket 62-3, Offender Correspondence Policy.

6

Under the DOC pornography policy, pornography and sexually explicit material are considered contraband. Docket 60 at ¶ 46. Pornographic material is defined as "books, pamphlets, magazines, periodicals, or any other publication or materials that feature nudity or sexually explicit conduct" or "features or includes photographs, drawings, or other graphic depictions of nudity or sexually explicit material." *Id.* at ¶ 46. Under the policy, sexually explicit is defined as "written or pictorial depictions of actual or simulated sexual acts including but not limited to sexual intercourse, oral sex, or masturbation." *Id.* at ¶ 47. Moreover, under the sex offender restrictions policy, the warden may prohibit any sex offender from possessing specific items of personal property. *Id.* at ¶ 48.

Hughbanks is a convicted sex offender. His psychosexual evaluation provides that he should not be allowed any use of or exposure to pornography, erotica, or access to the Internet. *Id.* at ¶ 49. Hughbanks received one disciplinary report for having a pornographic picture of an adult woman and one disciplinary report for engaging in consensual sexual contact with another inmate. Docket 110 at ¶ 50.

Mailroom and property office staff review every item of mail for contraband and prohibited content. If they find pictures or words that they think contain prohibited material, they may ask their supervisor or the associate warden to review the material. Docket 60 at ¶ 51. If the

7

correspondence is a book, magazine, or other mailing that has been previously rejected for its content, they may automatically reject the book without forwarding it to a supervisor or assistant warden. *Id.* When Associate Warden Jacobs reviews a mailing, she sometimes asks Warden Dooley to help her review the item to determine whether it should be rejected. *Id.* at ¶ 52. If she determines the mailing should be rejected, the inmate recipient receives a mailroom correspondence rejection notice. *Id.* If correspondence is rejected, it may be returned to sender or discarded by request of the inmate or by his failure to respond to the rejection notice. *Id.* at ¶  54. In the alternative, the portion of the mailing not in violation of the policy may be given to the offender. *Id.* Hughbanks claims that inmates are also permitted to have the rejected item mailed out to others. Docket 110 at ¶ 54. The inmate must provide written notice to mailroom staff advising whether the correspondence is to be returned to sender or destroyed; if the inmate fails to provide such notice within 60 days, the item is destroyed. Docket 60 at ¶ 55. Inmates may use the administrative remedy process to appeal a rejection notice. *Id.* at ¶ 56.

On March 16, 2010, defendant Randy Stevens was responsible for reviewing inmate mail. *Id.* at ¶ 57. Hughbanks received eight books that day; seven did not contain any prohibited material. *Id.* The eighth, <u>Dirty Spanish,</u>

was rejected because it contained offensive terms and some sexually explicit drawings. *Id.* Hughbanks disputes that the book contained offensive terms and sexually explicit drawings, noting that he has not been permitted to view the book. Docket 110 at ¶ 57.

Stevens sent Hughbanks a rejection notice, informing him that the book was rejected because it violated a prohibited act or any other rule, regulation, or directive governing the DOC and the prison and because it advocates violence or may cause violence or disruption. Docket 60 at ¶ 58. Hughbanks concedes that these were the reasons given, but he objects to defendants' characterization of the book. After receiving the rejection notice, Hughbanks had the book mailed to his mother, Martha Hughbanks. Docket 60 at ¶ 61.

The complete title to <u>Dirty Spanish</u> is <u>Dirty Spanish Everyday Slang from 'What's Up' to 'F*ck Off</u>.' *Id.* at ¶ 59. The author explains that the book is "designed to take your Spanish to the next level. So if you're looking for a grammar lesson, you're in the wrong spot. But if you want to tell your friend that he has a tiny dick or to get rid of the douchebag hitting on you in the bar, this is the book for you." *Id.* One chapter is devoted to "horny Spanish" and another is devoted to "angry Spanish." *Id.* at ¶ 60. Hughbanks objects to these assertions as "unjustified speculation" and notes that "if his goal was to

9

learn insults or phrases to incite people or solicit sex, [he] could ask his mother, aunt, and numerous Spanish-speaking inmates." Docket 110 at ¶ 60.

Hughbanks appealed the rejection of Dirty Spanish through the administrative remedy process. Docket 60 at ¶ 62. On March 17, 2010, Hughbanks submitted an information resolution request and argued that the book did not advocate violence or pose a threat of serious disruption of the institution or violate a prohibited act. *Id.* Hughbanks also argued that the rejection violated his First Amendment rights. *Id.* DeJong responded by informing him that the book was confiscated because it was sexually explicit; Hughbanks asserts he was told it was because it advocates violence. *Id.* at ¶ 63, Docket 110 at ¶ 63.

On March 19, 2010, Hughbanks filed a request for an administrative remedy and argued that no rule, regulation, directive, or prohibited act supported rejecting Dirty Spanish and that the rejection violated his First Amendment rights. Docket 60 at ¶ 64. Associate Warden Jacobs reviewed the book with Warden Dooley and determined it contained sexually explicit content that was both detrimental to Hughbanks' rehabilitation as a sex offender and otherwise prohibited. *Id.* at ¶ 65. The administrative remedy response notified Hughbanks that the book had been rejected because it "contains sexually explicit material" and his request to keep the book was denied. *Id.*

10

Hughbanks also sent a letter to Secretary of Corrections Tim Reisch regarding the rejection of Dirty Spanish. Docket 60 at ¶ 66. Secretary Reisch had his staff investigate the prison's rejection of the book, and they contacted Warden Dooley for more information. *Id.* Associate Warden Jacobs responded on Dooley's behalf. *Id.* at ¶ 67. She explained that Hughbanks was a registered sex offender currently awaiting sex offender treatment. *Id.* Hughbanks asserts that he has been awaiting treatment for five years and that he does not believe treatment is a realistic option. Docket 110 at ¶ 67. She also told him that the book was rejected under the Sex Offender Restrictions policy, due to the sexually explicit terms contained in the book. Docket 60 at ¶ 67. Because of these terms, the book was not conducive to Hughbanks' rehabilitation. *Id.* On April 29, 2010, Secretary Reisch responded to Hughbanks by letter. *Id.* at  ¶ 68. The letter assured Hughbanks that Warden Dooley and his staff had reviewed the matter and responded appropriately. *Id.*

On July 12, 2010, prison officials confiscated portions of Dirty Spanish from Hughbanks. *Id.* at ¶ 69. During a phone call with his mother, Hughbanks had asked her to photocopy Dirty Spanish four pages at a time and send them to him. *Id.* Hughbanks asserts that he asked his mother to send the pages in order to "both receive the parts that are not prohibited and to determine which pages were in question since the defendants also ignored

11

requests to provide page numbers in question so that the Plaintiff could have the specific pages in question reviewed for content." Docket 110 at ¶ 69. Hughbanks admitted to possessing the photocopied pages. Docket 110 at ¶ 69.

On July 12, 2010, mailroom staff officer Stevens was responsible for receiving and reviewing inmate mail. Docket 60 at ¶ 70. He opened and examined a book entitled <u>The Quotable Bitch</u> addressed to Hughbanks. *Id.* Because Stevens was unsure of whether the book was permitted under the DOC and prison policies, he contacted Associate Warden Jacobs. *Id.* at ¶¶ 70, 71. Associate Warden Jacobs reviewed the content of the book, keeping in mind that Hughbanks was a sex offender. *Id.* at ¶ 71. She saw several offensive and sexually explicit terms in the book and insolent quotes, which in her opinion could be used against staff or other inmates. *Id.* Associate Warden Jacobs thought the book would undermine Hughbanks' rehabilitation and accordingly, determined that the book should be rejected. *Id.* Hughbanks disputes Associate Warden Jacobs' recollection. Docket 110 at ¶ 71.

Associate Warden Jacobs also asked Warden Dooley to help her determine whether the book should be rejected. Docket 60 at ¶ 72. Warden Dooley agreed that the book contained material detrimental to Hughbanks' rehabilitation as a sex offender. *Id.* Thus, Associate Warden Jacobs told Stevens to reject the book. *Id.* Hughbanks partially disputes this. He argues

that exhibits provided by Associate Warden Jacobs show that she did not receive his psychosexual evaluation until almost two months after the rejection of the book. Docket 110 at ¶ 72. Officer Stevens sent a mailroom property rejection notice to Hughbanks on July 12, 2010, informing him that The Quotable Bitch was rejected. Docket 60 at ¶ 77. The rejection notice stated the book was being rejected because it violated a prohibited act or any other code, rule, regulation, or directive governing the DOC and the prison. *Id.* at ¶ 78. The notice also provided that the book depicted nudity or encouraged sexual behavior that is criminal in nature or may be detrimental to rehabilitation. *Id.* Hughbanks concedes that Stevens marked those lines, but he asserts that the response he received when he appealed the rejection was that the book was sexually explicit. Docket 110 at ¶ 78.

Hughbanks did not file any grievances related to the rejection of The Quotable Bitch. Docket 60 at ¶ 79. When Hughbanks received the rejection notice, he was suspended from using the administrative remedy process based on his previous abuse of the process. *Id.* Hughbanks asserts that he did not abuse the administrative remedy process because defendants have not rejected any of his grievances since the process was reinstated. Docket 110 at ¶ 79.

### C.   Cruel and Unusual Punishment Claim

On May 20, 2010, Hughbanks filed an informal resolution request and argued that special security officer Randy Stevens had violated the Eighth Amendment prohibition against cruel and unusual punishment. Docket 60 at ¶ 80. Hughbanks asserted that on May 11, 2010, he complained to Stevens about not receiving catalogs. *Id.* at ¶ 81. Hughbanks alleges that Stevens told him in a loud enough manner in front of other staff and inmates that he would just throw away all of the catalogs and tell everyone there were no catalogs because of Hughbanks. *Id.* Hughbanks sought Stevens' immediate suspension and termination for his willful endangerment of Hughbanks' safety. *Id.*

DeJong responded to Hughbanks' grievance on May 21, 2010. *Id.* at ¶ 82. She told him that his complaint had been forwarded to Stevens' supervisor for investigation. *Id.* She also told him that the South Dakota Bureau of Personnel Rules prohibit the dissemination of any action that might be taken against Stevens. *Id.* Hughbanks disputes this, noting that the Bureau of Personnel Rules are not available to inmates and asserting that the prison administration was unwilling to show him the policy. Docket 110 at ¶ 82.

On May 26, 2010, Hughbanks filed a request for administrative remedy, again addressing the issue of Stevens and the comment made in front of other

inmates. Docket 60 at ¶ 83. Hughbanks claims this comment violated his Eighth Amendment rights and that Stevens showed indifference to his duty to protect Hughbanks from assaults when he announced that he was going to throw away the catalogs and tell everyone it was because of Hughbanks. *Id.* Hughbanks requested that Stevens be suspended immediately. *Id.* Associate Warden Jacobs investigated and prepared a response for Warden Dooley. *Id.* at ¶ 84. Warden Dooley responded that Hughbanks' complaint was "forwarded to the appropriate supervisor for investigation and any required action" and that the South Dakota Bureau of Personnel Rules "prohibit the dissemination of any action that might be taken against the state employee." *Id.* Hughbanks disputes this, asserting that there is no evidence that an investigation was performed and that no one spoke to him as a part of the alleged investigation. Docket 110 at ¶ 84.

Stevens denies that he made any comments loudly or in the presence of other inmates that he would throw away the catalogs and tell everyone that it was because of Hughbanks. Docket 60 at ¶ 85. Hughbanks argues that this is a lie and that the "[t]hreat is evidenced by Stevens fulfilling his threat and that the catalogs for Edward R. Hamilton are no longer available to inmates. Docket 110 at ¶ 85.

## II.    STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980). The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise show that a genuine issue exists. *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002).

16

Rule 56 of the Federal Rules of Civil Procedure applies to prisoner litigants, despite the liberal construction afforded to their pro se pleadings. *Quam v. Minnehaha Cnty. Jail*, 821 F.2d 522 (8th Cir. 1987). The district court is not required to "plumb the record in order to find a genuine issue of material fact." *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996). Courts must remain sensitive, however, to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights, and the Eighth Circuit has explicitly disapproved of summary dismissal of prisoner pro se claims without regard for these special problems. *Nickens v. White*, 622 F.2d 967, 971 (8th Cir.), *cert. denied*, 449 U.S. 1018 (1980). "When dealing with summary judgment procedures the technical rigor is inappropriate where . . . uninformed prisoners are involved." *Ross v. Franzen*, 777 F.2d 1216, 1219 (7th Cir.1985).

## III.   DISCUSSION

Hughbanks filed suit under 42 U.S.C. § 1983, alleging that defendants violated his rights under the First, Fourteenth, and Eighth Amendments. Hughbanks seeks damages and prospective relief. Section 1983 provides a civil cause of action against any person who, under color of state law, causes a deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States. 42 U.S.C. § 1983; *McRaven v. Sanders*, 577 F.3d 974, 979 (8th Cir. 2009).

17

**A.   Defendants are Entitled to Summary Judgment on the Merits of Hughbanks' Challenge to the Correspondence Policy.**

**1.   The Bulk Mail Ban**

Defendants assert that Hughbanks has no First Amendment right to receive bulk-rate mail. They rely on *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 130-33 (1977). In that case, the Supreme Court upheld a prison regulation that prohibited prisoners from receiving bulk-rate mail from a prison union. *Id.* North Carolina prohibited inmate solicitation of other inmates, meetings between members of the union, and bulk-rate mailings concerning the union from outside sources. *Id.* at 122. Prison officials had determined that the existence of the union could lead to work stoppages, mutinies, riots, and chaos. *Id.* at 127. The union sought to send boxes of pamphlets to inmates, using bulk-rate mail, and to have the inmates distribute the pamphlets among the prison population. *Id.* at 130-33.  Here, Hughbanks seeks to receive bulk-rate mail for his individual consumption; there is no indication that he intends to distribute the material he receives to other inmates. Thus, *Jones* is factually distinguishable and defendants' assertion that there is no First Amendment right to receive bulk-rate mail expands the *Jones* holding.

Defendants also cite *Smith v. Maschner*, 899 F.2d 940, 944 (10th Cir. 1990) for the position that Hughbanks has no First Amendment right to receive bulk-rate mail. The *Smith* court held that a "complaint about

18

undelivered catalogs fail[ed] to raise an issue of constitutional magnitude." *Id.* But the Tenth Circuit Court of Appeals later distinguished the decision, noting the decision did not involve a challenge to a prison regulation or apply the *Turner* test. *See Jones v. Salt Lake Cnty.,* 503 F.3d 1147, 1159-60 (10th Cir. 2007). Rather, the decision was "limited to a prison official's one-time failure to deliver catalogs to an inmate." *Id.* Because the instant situation is factually distinguishable from *Jones* and *Smith*, this court assumes, without deciding, that Hughbanks has a First Amendment right to receive bulk-rate mail.

Assuming that Hughbanks has a First Amendment right to receive bulk-rate mail, he does not lose that right merely because he is incarcerated. *Procunier v. Martinez*, 416 U.S. 396, 408-10 (1974). Rather, he "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Leonard v. Nix*, 55 F.3d 370, 374 (8th Cir. 1995). These limitations "arise both from the fact of incarceration and from valid penological objectives–including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). Therefore, an inmate's constitutional rights may be diminished by prison regulations that are reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987).

A number of courts have upheld prison bans on bulk-rate mail and catalogs, finding they were reasonably related to legitimate penological interests such as the security of the prison, allocation of resources, and preventing fire hazards. *See Jones,* 503 F.3d at 1159-60 (noting that plaintiff likely had not met his burden of demonstrating that a county jail's catalog ban was unconstitutional, but remanding to district court for *Turner* analysis); *Sheets v. Moore*, 97 F.3d 164, 168 (6th Cir. 1996) (upholding a ban on bulk-rate mail); *Allen v. Deland*, 42 F.3d 1406 (10th Cir. 1994) (upholding prison policy banning catalogs); *Hrdlicka v. Cogbill*, No. 04-3020, 2006 WL 2560790 at *11 (N.D. Cal. Sept. 1, 2006) (upholding prison policy banning bulk-rate mail and prison officials' decision not to deliver magazine pursuant to that policy); *Dixon v. Kirby*, 210 F. Supp. 2d 792, 801 (S.D. W. Va. 2002) (upholding ban on bulk-rate mail and catalogs); *Allen v. Wood*, 970 F. Supp. 824, 829-30 (E.D. Wash. 1997) (upholding prison policy banning catalogs); *Alcala v. Calderon*, No. 95-3329, 1997 WL 446234 at *6 (N.D. Cal. July 24, 1997) (upholding prison ban on bulk-rate mail); *Kalasho v. Kapture*, 868 F. Supp. 882, 888 (E.D. Mich. 1994) (upholding prison policy banning the delivery of bulk-rate mail to inmates).

Hughbanks relies on contrary authority, which comes primarily from the Ninth Circuit Court of Appeals. *See Prison Legal News v. Lehman*, 397 F.3d 692, 701 (9th Cir. 2005) (holding that prison ban on bulk-rate mail and

catalogs violated the First Amendment); *Prison Legal News v. Cook*, 238 F.3d 1145, 1149-50 (9th Cir. 2001) (holding that prison regulation banning the receipt of subscription nonprofit mail based on the postal service rate was not rationally related to a legitimate penological objective); *Morrison v. Hall*, 261 F.3d 896, 905 (9th Cir. 2001) (holding prison regulation banning bulk-rate mail was unconstitutional as applied to for-profit subscription publications); *Allen v. Higgins,* 902 F.2d 682, 684 (8th Cir. 1990) (holding prison official was not entitled to qualified immunity because he denied an inmate's request to mail a money order for a government catalog without examining the catalog); *Brooks v. Seiter*, 779 F.2d 1177, 1181 (6th Cir. 1985) (holding that an inmate's complaint that pamphlets, magazines, and catalogs were not delivered was not frivolous). Because there is a split in authority and no controlling precedent from the Eighth Circuit, this court will independently analyze the constitutionality of the DOC correspondence policy ban on bulk-rate mail.

Four factors are relevant in determining whether a challenged regulation is reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89-90. The first factor examines whether the regulation is legitimate and neutral and rationally related to the underlying government objective. *Id.* Second, the court must examine whether the prisoners have an alternative means of exercising the right. *Id.* at 90. Third, the court must

21

examine the impact accommodation will have on guards and other inmates and other allocation of prison resources generally. *Id.* The fourth factor is the absence of ready alternatives. *Id.*

The court must also give "considerable deference" to the "determinations of prison administrators who, in the interests of security, regulate the relations between prisoners and the outside world." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989); *Falls v. Nesbitt*, 966 F.2d 375, 379 (8th Cir. 1992). This deference is accorded to prison administrators because the realities of running a penal institution are complex, and the courts are ill-equipped to deal with problems of prison administration and reform. *Jones*, 433 U.S. at 126. The *Turner* court observed that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are the province of the legislative and executive branches of government." 482 U.S. at 84-85.

Defendants assert that the South Dakota Department of Corrections correspondence policy is neutral and rationally related to a legitimate objective. The policy provides that "free advertising materials, fliers, non-subscriptive third class/bulk-rate mail, non-subscriptive or free catalogs or pamphlets will normally not be delivered to offenders." Docket 61-1 at 2. The policy bans all non-subscriptive third-class/bulk-rate mail and all non-subscriptive or free catalogs. As the *Alcala* court noted, this shows that the

policy is not aimed at suppressing expression. 1997 WL 446234 at *4.
Hughbanks disputes that the policy is content neutral, pointing out that in
addition to banning bulk-rate mail, the policy provides that "[m]aterials from
a recognized religious organization sent in care of the institutional Cultural
Activities Coordinator may be delivered to adult offenders." Docket 109, Brief,
at 18. Hughbanks asserts that the "policy is not constitutional based upon
the policy not applying equally to all mail. All mail deserves equal protection,
and it is shown by the Defendants that there is no equal protection since the
ban does not include religious material when everything else is banned." *Id.*
This argument is unavailing. The religious mail in question is delivered only if
it is sent in care of the institutional Cultural Activities Coordinator.
Presumably, if such mail otherwise qualifies as bulk-rate mail and is
addressed directly to an inmate, it will not be delivered. Thus, this exception
does not indicate an intent to suppress expression. Accordingly, the
correspondence policy's ban on bulk-rate mail is content neutral.

Defendants assert that the policy exists to manage prison resources
and preserve the safety of the institution. Preventing contraband from
entering the prison, fire safety, and allocating mailroom staff are the
objectives behind this policy. District courts have upheld similar policies on
these grounds. *See Kalashno*, 868 F. Supp. at 887 (reasoning that permitting
the delivery of bulk mail posed legitimate security challenges in that it would

create a tremendous influx of mail that prison officials would have to examine for contraband, the accumulation of bulk mail would pose a fire hazard due to the accumulation of excess property in a finite space, and prisoners could hide contraband in bulk mail and make cell searches more difficult); *Alcala*, 1997 WL 446234 at *4 (same). "Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights" of prisoners. *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). "Such considerations are peculiarly within the province and professional experience of corrections officials, and, in the absence of substantial evidence in the record that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier*, 417 U.S. 817, 827 (1974).

Hughbanks contends that the fire hazard concern is exaggerated. Docket 109, Brief, at 28. According to Hughbanks, "it is irrational to prohibit prisoners from receiving bulk-rate mail and catalogs on the theory that it reduces fire hazards because the DOC already regulates the quantity of possessions that prisoners may have in their cell." *Id.* (citing *Lehman*, 397 F.3d at 700). But defendants point out that it is not just the quantity of paper in cells that poses a fire hazard, but the accumulation of paper in the entire facility. Docket 114, Reply at 114. Hughbanks also argues that limited prison

24

resources should not be considered and that existing staff could process the free catalogs and bulk-rate mail if they worked additional days and omitted other duties. Docket 109, Brief at 27-28. But these are matters peculiarly within correctional officers' professional expertise. *See Bell v. Wolfish*, 441 U.S. 520, 546 (1979). Thus, the court must defer to the judgment of prison officials on how the correspondence policy helps maintain the daily security of the prison and how a change would compromise this. Hughbanks also asserts that there is no additional risk of contraband entering the facility if the ban is lifted. Even if, as Hughbanks contends, most catalogs do not contain pornographic or other prohibited content, the mailroom and property officers would still be required to review every item for contraband regardless of whether the previous month's catalog contained contraband. Thus, despite the split in authority, Hughbanks has not demonstrated that the DOC's correspondence policy is not rationally related to at least one legitimate penological purpose.

The next factor is whether there is an alternative means available to exercise the asserted right. *Turner*, 482 U.S. at 90. Defendants assert that inmates at Mike Durfee State Prison have alternative means of exercising their First Amendment rights. Inmates may review catalogs in the prison property office, and the prison has a library that inmates may access. Hughbanks disputes that these constitute alternative means of exercising his

First Amendment rights. He argues that because there are an insufficient number of catalogs, inmates must wait to check them out. But delays are incidental when one considers that inmates may choose to prepay the postage on any catalog and have it mailed first or second class. *See Kalashno*, 868 F. Supp. at 887. Because the application of the policy allows a broad range of materials to be sent, received, and read, this prong of the *Turner* test is satisfied. *Thornburgh v. Abbott*, 490 U.S. 401, 418 (1989). Therefore, the court finds that alternative means of exercising the right exist.

The next factor is the impact of requiring the delivery of bulk mail to inmates. Thus, this court must consider the impact on "guards and other inmates and prison resources generally" if Hughbanks' proposal is adopted. *Turner*, 482 U.S. at 90. Defendants assert that permitting bulk-rate mail to be delivered would present safety and security concerns and limit prison resources. In addition to processing the increased volume of mail, prison employees would have to individually review it for contraband before delivery. Docket 60 at ¶ 18. The current staff at the prison could not process the bulk-rate mail it currently receives, let alone the influx of additional bulk-rate mail the prison would receive if the policy were changed. Docket 60 at ¶ 17. Moreover, because the challenged policy is a state DOC policy, any changes ordered to the policy would have to be made in every correctional institution in South Dakota, not just Mike Durfee State Prison. As noted by numerous

26

courts that have upheld similar policies, these negative impacts on prison operations validate the policy. *See Dixon*, 210 F. Supp. 2d at 800-01. Thus, this court will defer to prison officials' discretion.

The final factor to be considered is whether there are alternatives to the existing policy that "fully accommodate the prisoner's rights at de minimis cost to valid penological interest." *Turner*, 482 U.S. at 91. "The absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable. . . ." *Id.* The purpose of this factor is to ensure that a regulation is not an "exaggerated response" to legitimate concerns. *Sheets*, 97 F.3d at 169. But "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 90-91; *Kalashno*, 868 F. Supp. at 888.

Hughbanks proposes that the DOC permit inmates to receive all catalogs, advertisements, third-class and bulk-rate mail subject to several conditions. First, the mail must fit into an assigned space. Second, the majority of the items advertised could not be detrimental to rehabilitation, criminal in nature, or promote disruption of the institution. The number of catalogs would be limited to ten. The final condition is that the mail must be addressed to the intended recipient rather than "current resident."

Defendants assert that, even with these limitations, they could not comply with the proposed policy without incurring substantial expense and without compromising the safety, security, and order of the prison. Moreover, the policy that Hughbanks asserts is unconstitutional is a state-wide policy. Thus, invalidating the policy in the present case, which deals only with Mike Durfee State Prison, would require the DOC to change the policy at all institutions. Hughbanks suggests that different policy changes could be made, particular to each institution. But this alternative would be even more burdensome. "When the accommodation of an asserted right will have a significant ripple effect on fellow inmates or prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90. Because the policy Hughbanks challenges is statewide, his suggested accommodation would have a significant effect on South Dakota inmates and prison staff.

Hughbanks asserts that an alternative would be to have security officers inspect the incoming bulk-rate mail for contraband, but then have inmates process the catalogs for distribution. This alternative would not accommodate the prisoner's rights at a "*de minimis* cost" to valid penological interests. As defendants have pointed out, distributing the catalogs is not where the problem lies. Rather, processing the increased volume of mail for contraband and prohibited content would be unduly burdensome and

28

potentially require defendants to hire additional staff. It also has the potential to allow more contraband to slip through, as staff would be overwhelmed by the surge in mail to process. Hughbanks also suggests that the prison return to having a mailroom officer work six days a week, rather than the current five-day schedule. This proposed change could not be implemented with only *de minimis* costs. It is Hughbanks' burden to not only provide an alternative to the policy, but to show it could be implemented with only *de minimis* costs. *See Jones.*, 503 F.3d at 1160. Thus, this factor, along with all the others, weighs in favor of the defendants.

## 2.   The Lack of a Rejection Notice

Hughbanks also asserts that his Fourteenth Amendment due process rights are violated because the policy does not require defendants to provide him with rejection notices when a piece of bulk-rate mail is rejected. Due process guarantees apply only when a constitutionally protected liberty or property interest is at stake. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). In order for Hughbanks to successfully argue that his due process rights are violated by the current policy, he must first establish that he has a protected First Amendment interest in receiving the rejected catalogs. *See, e.g., Kalasho*, 868 F. Supp. at 889.

This court has assumed, without deciding, that Hughbanks has a First Amendment right to receive bulk-rate mail. *See supra* Part I.A. While the

29

United States Supreme Court has upheld a policy ordering prisons to provide rejection notices to both inmates and senders of personal correspondence, *Procunier*, 416 U.S. at 418, subsequent Supreme Court case law holds that regulations governing mail to prisoners must be analyzed under the more deferential standard set forth in *Turner v. Safley. See Thornburgh*, 490 U.S. at 413 (holding that correspondence entering a prison must be analyzed under the *Turner* reasonableness standard, rather than the stricter test set forth in *Procunier*).[2] Therefore, the current notice policy will be upheld if it is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 87.

The court must first examine whether the current policy is neutral and rationally related to the underlying government objective. *Turner*, 482 U.S. at 89-90. The current policy is neutral, in that it bans the delivery of bulk-rate mail outright and does not provide for a notice of its rejection to the inmate or the sender. Thus, the regulation classifies mail on the basis of its postal category rather than its content. Even considering the facts in the light most

---

[2] The publisher/sender of the publication was a party in *Procunier*. Here, Hughbanks attempts to assert the rights of publishers who are not parties to this litigation. He does not have standing to do so. The "irreducible constitutional minimum of standing requires a showing of injury in fact to the plaintiff that is fairly traceable to the challenged action of the defendant, and likely to be redressed by a favorable decision." *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 591 (8th Cir. 2009). Hughbanks does, however, have standing to assert a claim that he is entitled to notice when bulk-rate mail is rejected.

favorable to Hughbanks, he cannot demonstrate that the current policy is not rationally related to the underlying objective of the policy, which is to conserve prison resources and preserve security and order within the prison.

The second factor is whether an alternative means of exercising the right exists. *Turner*, 482 U.S. at 90. The current correspondence policy provides for an alternative means of exercising Hughbanks' asserted right to notification for refused bulk-rate mail. If Hughbanks prepaid the postage and had the materials he seeks mailed first class, he would receive a rejection notice if it were deemed undeliverable. *See* Docket 61-1, Offender Correspondence Policy. *See also Alcala*, 1997 WL 446234 at *6 (noting that plaintiff had an alternative means of exercising his asserted right to notification because the challenged policy permitted him to prepay the postage on items that would normally be sent third class and prison policy provided for rejection notices for items mailed first class).

The impact of accommodating the asserted right is the third factor. *Turner*, 482 U.S. at 90. Thus, the court must examine the impact on guards, other inmates, and prison resources generally. *Id.* As noted earlier, the challenged policy is a state-wide DOC policy. It therefore applies to all corrections institutions in the state of South Dakota, not just Mike Durfee State Prison where Hughbanks is housed. Defendants argue that substantial resources would be required to provide rejection notices to the recipients and

31

senders of bulk-rate mail. Hughbanks denies this, but he has not pleaded any facts or supplied any evidence to support his denial. This is insufficient to demonstrate the existence of a genuine issue of material fact. In order to withstand summary judgment, a party must set forth specific facts by affidavits or otherwise show that a genuine issue exists. *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002).

The final factor in the reasonableness analysis is the absence of ready alternatives. *Turner*, 482 U.S. at 90. Hughbanks has not identified any alternative that fully accommodates his asserted right to notification at *de minimis* cost to prison security. It is Hughbanks' burden to not only provide an alternative to the policy, but to show it could be implemented with only *de minimis* costs. *See Jones,* 503 F.3d at 1160. Because Hughbanks has failed to provide an alternative to the current notification policy, this factor weighs in favor of defendants.

After considering the facts in the light most favorable to Hughbanks, the court concludes that he has failed to demonstrate that the DOC correspondence policy banning bulk mail without a rejection notice is unconstitutional. Defendants are not liable in either their official or their individual capacities. Accordingly, defendants are entitled to summary judgment, in both their official and individual capacities on the merits of Hughbanks' mail and rejection notice claims.

**B. Defendants are Entitled to Summary Judgment on Hughbanks' Claims Relating to <u>Dirty Spanish</u> and <u>The Quotable Bitch</u>.**

**1. Hughbanks' Official Capacity Claims Fail**

Defendants assert that Hughbanks' official capacity claims relating to the rejection of <u>Dirty Spanish</u> and <u>The Quotable Bitch</u> cannot survive summary judgment because Hughbanks cannot prove that an unconstitutional policy or custom caused the rejection. "A § 1983 action against a government official in his official capacity . . . is tantamount to an action directly against the public entity of which the official is an agent." *Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987). Thus, "[b]ecause the real party in interest in an official capacity suit is the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). "In an official capacity suit, the plaintiff must prove more than that his constitutional rights were violated by a named individual defendant, for a governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the violation." *Clay*, 815 F.2d at 1170. In other words, "the entity's official policy or custom must have caused the constitutional violation; there must be an affirmative link or a causal connection between the policy and the particular constitutional violation alleged." *Id.*

Hughbanks contends that "[t]he way the defendants used policies 'Sex Offender Restrictions' and 'Offender Correspondence' caused the rejection of

Dirty Spanish and The Quotable Bitch." Docket 109, Brief at 50. Hughbanks

does not assert that the policies are unconstitutional on their face, but argues

that they are unconstitutional as applied.[3]

"[W]here the policy relied upon is not itself unconstitutional,

considerably more proof than the single incident will be necessary in every

case to establish both the requisite fault on the part of the [government

official] and the causal connection between the policy and the constitutional

deprivation." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985). Liability

for an unconstitutional custom or policy cannot generally arise from a single

act. *Marksmeier v. Davie*, 622 F.3d 896, 902 (8th Cir. 2010). Thus, the two

incidents Hughbanks has alleged here are insufficient to show a policy or

custom of unconstitutional action.

But in rare cases "a public official's single incident of unconstitutional

activity can establish the requisite policy if the decision is 'taken by the

highest officials responsible for setting policy in that area of the government's

business.'" *Rynders v. Williams*, 650 F.3d 1188, 1195 (8th Cir. 2011) (quoting

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)). In such case, liability

"attaches only where the decision maker possesses final authority to establish

---

[3] This court has already held that the pornography policy is
constitutional. *See Salinas v. Janklow,* Civ. 99-4204 (D.S.D. 2003); *King v.
Dooley,* Civ. 00-4052 (D.S.D. 2003). Policies prohibiting books that advocate
violence or that may cause violence have been upheld as rationally related to
prison penological interests. *See Thornburgh*, 490 U.S. at 404-06.

[policy] with respect to the action ordered." *Davison v. City of Minneapolis, Minn.,* 490 F.3d 648, 659 (8th Cir. 2007). Warden Dooley is the only defendant who could potentially qualify as a decision maker. Warden Dooley appears to possess final authority to interpret and apply the policies within Mike Durfee State Prison pertinent to rejecting <u>Dirty Spanish</u> and <u>The Quotable Bitch</u>. But the policies Warden Dooley applied in reaching his decision to reject the books are state-wide DOC policies, rather than policies specific to Mike Durfee State Prison. Thus, he is not a final policy maker. *See* Docket 61, Affidavit of Bob Dooley, at ¶ 4. Conversely, Secretary Reisch would qualify as the policy maker for the DOC policies, but there is no contention that he made the decision to reject <u>Dirty Spanish</u> and <u>The Quotable Bitch.</u> *See* Docket 62, Affidavit of Tim Reisch, at ¶ 10. Accordingly, Hughbanks has failed to show a policy or custom of unconstitutional action or that defendants' actions fall within the "final or authorized decision maker" line of cases. Defendants are entitled to summary judgment on Hughbanks' official capacity claims relating to the rejection of <u>Dirty Spanish</u> and <u>The Quotable Bitch</u>.

### 2.   Individual Capacity Claims

In an individual capacity suit under § 1983, a plaintiff seeks to impose personal liability on a state actor for actions taken under color of state law. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978). Only state

35

actors whose personal conduct caused the deprivation of a federal right are liable under § 1983. *Pulaski Cnty. Republican Comm. v. Pulaski Cnty. Bd. of Election Comm'rs.*, 956 F.2d 172, 174 (8th Cir. 1992) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). Section "1983 liability requires personal involvement in or direct responsibility for actions resulting in [the] violation." *Carter v. Hassell*, 316 Fed. App'x 525, 525 (8th Cir. 2008) (citing *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985)); *see also Marchant v. City of Little Rock, Ark.*, 741 F.2d 201, 204 (8th Cir. 1984) (dismissing a claim because the individual "had no knowledge or connection to" the alleged violation); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993) (dismissing a § 1983 case where a prisoner claimed that prison officials inappropriately took away his rosary because "none of the prison officials sued by him [were] responsible for this confiscation").

### a. Tami DeJong, Nicole St. Pierre, and Secretary Reisch Lack Personal Involvement.

Defendants assert that Hughbanks' individual capacity claims against DeJong and St. Pierre are not based on personal involvement. Hughbanks has not asserted that DeJong or St. Pierre were personally involved in rejecting the books. *See* Docket 109 at 15, 17-18. Thus, DeJong and St. Pierre are entitled to the entry of summary judgment in their favor.

Defendants also argue that Hughbanks' claim against Secretary Reisch is not based on personal involvement, but rather his supervisory role.

36

Hughbanks asserts that Secretary Reisch was personally involved as the "final policy maker" for the DOC policies that are in question and implementation of the policies. But Hughbanks is not challenging the constitutionality of the policies used to reject the books. Thus, this is insufficient involvement. Accordingly, Secretary Reisch is entitled to summary judgment in his individual capacity because he was not personally involved in rejecting the books.

### b.  Warden Dooley Directly Participated in Denying the Books.

Defendants, citing *Ouzts v. Cummins*, 825 F.2d 1276 (8th Cir. 1987) (per curiam), also assert that Warden Dooley lacks sufficient personal involvement to be liable under § 1983. Defendants claim that "a warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement." *Id.* at 1277. But Warden Dooley directly participated in denying Hughbanks his First Amendment rights, which is sufficient personal conduct for a supervisor to be held liable under § 1983:

> A supervisor cannot be held liable for an employee's unconstitutional actions based on a theory of respondeat superior. Rather, a supervisor incurs liability for a violation of a federally protected right when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation. The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see.

*Ottman v. City of Independence, Mo.*, 341 F.3d 751, 761 (8th Cir. 2003) (alteration in original) (citation and internal quotations omitted). "[A] supervisor can act with 'deliberate, reckless indifference' even when he does not act 'knowingly.'" *Kahle v. Leonard*, 477 F.3d 544, 551-52 (8th Cir. 2007). "A supervisor can be found liable under § 1983 for deliberate indifference if he is aware of 'a substantial risk of serious harm,' even if he is not aware that the harm has, in fact, occurred." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). But a supervisor "'is only liable for his . . . own misconduct' and is not 'accountable for the misdeeds of [his] agents' under a theory such as respondeat superior or supervisor liability." *Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 928 (8th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).

A warden may, however, be liable for his own personal involvement. *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988) (although warden's receipt of memos and grievances demanding medical treatment did not in and of itself establish warden's knowledge that prisoner had serious medical need, the level of warden's personal involvement in the medical staff's decision that no medical need existed was a question of fact to be determined at trial). The warden may also be liable for his policy decisions regarding the allegedly unconstitutional prison conditions. *Martin v. Sargeant*, 780 F.2d 1334, 1338 (8th Cir. 1985).

38

Here, Warden Dooley admits that he assisted Associate Warden Jacobs in reviewing Dirty Spanish and The Quotable Bitch and in determining that they contained content detrimental to Hughbanks' rehabilitation as a sex offender. *See* Docket 61, Affidavit of Bob Dooley, at ¶ 15. This constitutes involvement that is both personal and direct. *See Schnitzler v. Reisch*, 518 F. Supp. 2d 1098, 1104, 1113-15 (finding there was a question of material fact regarding the level of Warden Dooley's personal involvement in determining that an alternative version of sex offender treatment would not be provided to a prisoner who refused to participate due to religious objections). Accordingly, Warden Dooley is not entitled to summary judgment in his individual capacity based on a lack of personal involvement.

### C.  Warden Dooley, Associate Warden Jacobs, and Officer Stevens Did Not Violate Hughbanks' First Amendment rights when they rejected Dirty Spanish and The Quotable Bitch.

The only individual capacity claims remaining are Hughbanks' claims against Warden Dooley, Associate Warden Jacobs, and Officer Stevens. Hughbanks alleges that defendants denied him the books Dirty Spanish and The Quotable Bitch on the basis of content in the absence of a valid penological interest, thus violating the First Amendment under the standards of *Thornburgh v. Abbott*, 490 U.S. 401 (1989) and *Turner v. Safley*, 482 U.S. 78 (1987).

39

Regulations affecting the sending of mailings and publications to prisoners are analyzed under the *Turner* reasonableness standard. Under this standard, a regulation or decision that impinges upon a prisoner's constitutional rights is valid if it is reasonably related to legitimate penological interests. *Turner*, 482 U.S. 78. In considering the question, the court must decide "after an independent review of the evidence" whether the decision to reject the books is an "exaggerated response to prison concerns." *Salaam v. Lockhart*, 905 F.2d 1168, 1171 (8th Cir. 1990), *cert. denied,* 498 U.S. 1026 (1991).

In *Thornburgh*, the Supreme Court approved regulations excluding publications that the warden determined were "detrimental to the security, good order, or discipline of the institution . . . or might facilitate criminal activity." *Id.* at 416. The regulations in question provided criteria for rejection, including whether the publication "depicts, describes, or encourages activities which may lead to the use of physical violence or group disruption" or is "sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity." *Id.* Since *Thornburgh*, lower courts have afforded some latitude to decisions by prison officials to exclude publications from prisoners on the basis of content. *See, e.g., Duamutef v. Hollins*, 297 F.3d 108, 112 (2d Cir. 2002) (applying "heightened deference" to a prison official's decision to reject

40

a controversially titled book concerning financial advice and finding no constitutional violation); *Amatel v. Reno*, 156 F.3d 192, 193 n.1 (D.C. Cir. 1998) (upholding ban on distribution of all commercial material that "is sexually explicit or features nudity" as reasonably related to goal of rehabilitation). But where a prison official denies a publication on the basis of content without a legitimate penological purpose, courts have found a constitutional violation. *See, e.g., Sutton v. Rasheed*, 323 F.3d 236 (3d Cir. 2003) (concluding denial of Nation of Islam religious books was unconstitutional but defendants were entitled to qualified immunity because the right was not clearly established); *Williams v. Brimeyer*, 116 F.3d 351, 354 (8th Cir. 1997) (overturning a policy that was "in effect" a blanket ban on materials from the Church of Jesus Christ Christian as unconstitutional and noting that inmate should have been permitted to receive the particular publications that were withheld from him because they did not counsel violence and there was no evidence they had ever caused a disruption); *McCabe v. Arave*, 827 F.2d 634, 638 (9th Cir. 1987) (overturning a "ban" on Church of Jesus Christ books which advocated racial separatism but not violence or illegal activity as a means of achieving that goal).

Four factors are relevant in determining whether a challenged regulation or decision is reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89-90. The first factor examines whether the regulation is

legitimate and neutral and rationally related to the underlying government objective. *Id.* Second, the court must examine whether the prisoners have an alternative means of exercising the right. *Id.* at 90. Third, the court must examine the impact accommodation will have on guards and other inmates and other allocation of prison resources generally. *Id.* The fourth factor is the absence of ready alternatives. *Id.*

The court must first examine whether the denial of <u>Dirty Spanish</u> and <u>The Quotable Bitch</u> is reasonably related to the underlying government objective. *Turner*, 482 U.S. at 89-90. Each book, and the reasons given for its rejection, is considered in turn.[4]

Defendants argue that <u>Dirty Spanish</u> contains sexually explicit material. The DOC pornography policy defines sexually explicit as:

> "Sexually explicit" includes written and pictorial depiction of actual or simulated sexual acts including but not limited to sexual intercourse, oral sex or masturbation. Sexually explicit material also includes individual pictures, photographs, or drawings of nudity or sexually explicit conduct that are not part of a book, pamphlet, magazine, periodical or other publication.

---

[4] Defendants contend that a prison official may base a security decision on and reject a book based solely on its title. *See Daker v. Ferrero*, 506 F. Supp. 2d 1295, 1308 (N.D. Ga. 2007) (citing *Duametef*, 297 F.3d at 110). But there is Eighth Circuit precedent establishing that a prison official may not reject a publication without first reviewing it. *See Allen v. Higgens*, 902 F.2d 682 (8th Cir. 1990).

Docket 61-2.[5] Defendants provided two exhibits, one of which shows a man burying his face in a woman's cleavage. Ex A7. The man and the woman are fully clothed. *Id.* The caption to the cartoon is, "Could I motorboat your . . . ? or "*¿Puedo hacer trompetillas con tus . . . ? Id.* This picture depicts a sexual act and thus is sexually explicit under the DOC pornography policy.

Defendants' next reason for rejecting <u>Dirty Spanish</u> is that it contains material detrimental to Hughbanks' rehabilitation as a sex offender. Associate Warden Jacobs concluded that the book was detrimental to his rehabilitation as a sex offender because it contained sexually explicit terminology such as "c***sucker" and "mother's pussy." Docket 60 at ¶ 67. Hughbanks' psychosexual assessment provides that he should not be allowed any use or exposure to pornography, erotica, or access to the internet. *Id.* at ¶ 49. Moreover, Hughbanks has a disciplinary history of having pornography in his possession and inappropriate sexual contact with other inmates. *Id.* at ¶ 50.

Rehabilitating offenders is a "paramount objective of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 823 (1974). Evaluating an offender's

---

[5] Hughbanks filed a "Request for Definitions to be Applied in the Motion for Summary Judgment." Docket 108. In this motion, Hughbanks sought to have the DOC policy definitions of sexually explicit and pornographic material applied, but created his own definition of detrimental to the rehabilitation of a sex offender. Defendants do not object to the application of the policy definitions, but do object to the proposed definition of detrimental to the rehabilitation of a sex offender. Docket 114, Reply Brief, at 9 n.2. The court will apply the DOC policy definitions, but not Hughbanks' proposed definition of detrimental to the rehabilitation of a sex offender.

rehabilitation, and what may be detrimental to it, is "committed to the considered judgment of prison administrators[.]" *Fegans v. Norris*, 537 F.3d 897, 902 (8th Cir. 2008) (internal citations omitted). Consequently, federal courts have consistently upheld prison officials' determinations that certain materials are detrimental to a sex offender's rehabilitation. *See Wickner v. McComb*, No. 09-1219, 2010 WL 3396918 at *6 (D. Minn. July 23, 2010) ("[P]rison officials were reasonable in thinking that denying Plaintiff access to the photographs in issue would advance the legitimate penological interests in maintaining prison security, rehabilitating sex offenders, and reducing sexual harassment of prison guards."); *Frazier v. Ortiz*, No. 07-02131, 2010 WL 924254 at *12 (D. Colo. March 10, 2010) (finding a sex offender had no First Amendment right to possess sexually suggestive materials that could be detrimental to his rehabilitation); *Hunsaker v. Jimerson,* No. 08-01479, 2010 WL 3323415 at *5-6 (D. Colo. July 9, 2010) (holding sex offender had not demonstrated likelihood of success on the merits on his claim that prison improperly censored his mail preventing him from receiving publications with nudity); *Frink v. Arnold*, 842 F. Supp. 1184, 1191 (S.D. Iowa 1994) ("[Prison officials] have established a rational connection between the restriction at issue in this case [ban on sexually graphic written materials] and the governmental interest in rehabilitating sex offenders[.]"). As discussed above, Dirty Spanish contains sexually explicit materials, which Warden Dooley and

Associate Warden Jacobs determined would be detrimental to Hughbanks'
rehabilitation as a sex offender after reviewing the contents of the book and
Hughbanks' psychosexual evaluation. Thus, the denial of <u>Dirty Spanish</u> was
rationally related to the legitimate, penological purposes of preventing
sexually explicit material from entering the prison and furthering Hughbanks'
rehabilitation as a sex offender.

Defendants assert that Hughbanks was denied <u>The Quotable Bitch</u>
because it contained sexually explicit terms and was not conducive to his
rehabilitation as a sex offender. Defendants assert the following quote as
evidence of sexually explicit content: "I won't allow you to treat me like some
slut you can just bang a couple of times and throw in the garbage." *Id.* While
this quote does not qualify as sexually explicit under the policy definition,
defendants could reasonably conclude that the depiction of women espoused
in the quote was detrimental to Hughbanks' rehabilitation as a sex offender.

Defendants also assert that <u>The Quotable Bitch</u> contains a quote which
makes reference to an undressed baby. Docket 60 at ¶ 76. The quote in
question is from Queen Victoria and is as follows: "An ugly baby is a very
nasty object, and the prettiest is frightful when undressed." Exhibit B41.
Defendants admit that the quote is not a sexual reference, but they assert that
because Hughbanks is a sex offender who violated a young boy, the reference
is detrimental to his rehabilitation. *Id.* The determination of what may be

45

detrimental to an offender's rehabilitation is "committed to the considered judgment of prison administrators" and thus entitled to deference. *Fegans*, 537 F.3d at 902. As a result, this court will defer to defendants' conclusions regarding the effect of material contained in The Quotable Bitch on Hughbanks' rehabilitation. Thus, the court finds that the rejection of The Quotable Bitch is rationally related to the legitimate, penological purpose of furthering Hughbanks' rehabilitation as a sex offender. Thus, the first *Turner* factor weighs in favor of defendants regarding both books.

The second *Turner* factor examines whether Hughbanks has an alternative means of exercising his First Amendment rights. *Id.* at 90. Defendants assert that Hughbanks could purchase a Spanish grammar book that does not contain sexually explicit terms. Additionally, Hughbanks does have a variety of books available to him in the prison library. Thus, the second *Turner* factor weighs in favor of defendants.

The third factor is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. Defendants assert that permitting sexually explicit materials to enter the prison would be detrimental to the prison's security and order. Hughbanks did not brief this issue. Thus, the third *Turner* factor weighs in favor of defendants.

The fourth and final *Turner* factor focuses on the absence or existence of "ready alternatives." 482 U.S. at 90. If there is an alterative "that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91. Hughbanks has not offered any ready alternatives. Accordingly, the fourth *Turner* factor also weighs in favor of defendants.

Because the *Turner* factors weigh in defendants' favor, the court concludes that the facts alleged, construed in the light most favorable to Hughbanks, the nonmoving party, establish that the content-based rejection of Dirty Spanish and The Quotable Bitch was rationally related to legitimate penological purposes. In other words, Hughbanks has failed to show that his First Amendment rights were violated. Because Hughbanks has not shown that his First Amendment rights were violated, the court does not need to address the defendants' qualified immunity defense. *See Schmidt v. City of Bella Villa*, 557 F.3d 564, 574 (8th Cir. 2009) ("Since we find no constitutional violation, we need not address the issue[ ] of qualified immunity[.]").

### D. Defendants Are Entitled to Summary Judgment on the Merits of Hughbanks' Eighth Amendment Claim.

Hughbanks asserts that Officer Stevens violated the Eighth Amendment's prohibition of cruel and unusual punishment when he responded to Hughbanks' complaints by stating loudly and in the presence of

47

other inmates that he would throw all the catalogs away and tell everyone there were no catalogs because of Hughbanks. Docket 60 at ¶ 80. Although Stevens contends that he did not make the referenced comments loudly or in the presence of other inmates, *id.* at ¶ 85, at this stage in the proceedings, the court considers the facts in the light most favorable to Hughbanks, the nonmoving party. Thus, the court assumes that Stevens did say he would throw the catalogs away because of Hughbanks and that he said this in front of other inmates.

To establish an Eighth Amendment claim, Hughbanks must satisfy a two-pronged test. *Norman v. Schuetzle*, 585 F.3d 1097, 1103-04 (8th Cir. 2009). The first prong is an objective test, which asks whether the deprivation suffered by the plaintiff is sufficiently serious to rise to the level of a constitutional violation. *Id.* The second prong of the test is subjective; the plaintiff must prove that prison officials had a "sufficiently culpable state of mind" amounting to at least "deliberate indifference." *Id.*

Stevens' actions in threatening to throw away the catalogs and blaming it on Hughbanks do not violate the Eighth Amendment. Mere verbal threats made by a state actor generally are not sufficient to state a § 1983 claim. *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985). " 'Mere threatening language and gestures' of a state actor 'do not, even if true, amount to constitutional violations.' " *Hopson v. Fredericksen*, 961 F.2d 1374, 1378 (8th

Cir. 1992) (quoting *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir.), *cert. denied*, 464 U.S. 998) (1983)). Verbal harassment, abuse, and threats, including profanity, without any physical injury, do not amount to constitutional violations no matter how reprehensible the conduct may be. *Kurtz v. City of Shrewsbury*, 245 F.3d 753, 759 (8th Cir. 2001). The Eighth Circuit has recognized a narrow exception for conduct that amounts to "wanton act[s] of cruelty" that can be categorized as "brutal." *Burton v. Livingston*, 791 F.2d 97 (8th Cir. 1986). In *Burton*, the Eighth Circuit held that a guard who pointed a pistol at a prisoner and stated, "nigger run so I can blow your Goddamn brains out, I want you to run so I'll be justified" could be held accountable under § 1983. *Id.* at 99. But Hughbanks' allegations do not fit that narrow exception. He has not alleged that Stevens had a weapon or threatened him with physical harm. All he has alleged is that Stevens threatened to take the catalogs away and say it was Hughbanks' fault. Thus, Hughbanks has not alleged a sufficiently serious deprivation for his Eighth Amendment claim to survive summary judgment.

Nor has Hughbanks demonstrated that Stevens' conduct was deliberately indifferent. *Norman*, 585 F.3d at 1109-11. The Supreme Court has held that "subjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause" and is an appropriate "test for 'deliberate indifference'

49

under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994). Hughbanks asserts that Stevens "would know that if inmates find out they are going to lose something or lost something because of another inmates [sic], it often leads to physical assault and verbal harassment by other inmates towards the person that caused them to lose that item." Docket 109, Brief at 56. But the Eighth Circuit has held that a prison official is not deliberately indifferent to another inmate's safety by showing an inmate another inmate's kites or grievances. *Norman*, 585 F.3d at 1109-11. Sharing an inmate's complaints with another inmate about a prison official or about prison policies does not place the complaining inmate in danger of retaliation by other inmates. Accordingly, Hughbanks' claim does not satisfy either the objective prong or the subjective prong of the test required for an Eighth Amendment claim. Defendants are, therefore, entitled to summary judgment on the merits of Hughbanks' Eighth Amendment claim in both their individual and official capacities.

## IV.   CONCLUSION

Defendants are entitled to summary judgment on the merits of Hughbanks' claim that the DOC correspondence policy relating to bulk mail and rejection notices for bulk mail is unconstitutional.

Because Hughbanks has failed to demonstrate that an official policy or custom caused the constitutional violation, defendants are entitled to

summary judgment in their official capacities on Hughbanks' claim relating to the rejection of <u>Dirty Spanish</u> and <u>The Quotable Bitch.</u> Defendants DeJong, St. Pierre, and Secretary Reisch are entitled to summary judgment on Hughbanks' individual capacity claims relating to the rejection of <u>Dirty Spanish</u> and <u>The Quotable Bitch</u> because they lack personal involvement. Warden Dooley, Associate Warden Jacobs, and Officer Stevens are summary judgment on the merits of  Hughbanks' claims relating to the rejection of <u>Dirty Spanish</u> and <u>The Quotable Bitch</u>.

Defendants are entitled to summary judgment on the merits of Hughbanks' Eighth Amendment claim. Accordingly, it is

ORDERED that defendants' motion for summary judgment (Docket 58) is granted.

Dated February 2, 2012.

BY THE COURT:


*/s/ Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE